**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

IN THE MATTER OF:                    **CASE NO. 18-10864**

**VISION INVESTMENT GROUP, INC.**        **Chapter 11**

    Debtor.

### DISCLOSURE STATEMENT

### I.

### *A. Introduction*

    Vision Investment Group, Inc., the Debtor-in-Possession, provides this Disclosure Statement to all of its creditors in order to disclose that information deemed by the Debtor to be important and necessary for exercising their right to vote for acceptance of the Plan of Reorganization filed with the Court on **February 20, 2019**.

    Those creditors whose claims are impaired under the Plan may vote on the Plan by filling out and mailing to Daniel J. Skekloff and Scot T. Skekloff, Haller & Colvin, PC, 444 E. Main Street, Fort Wayne, Indiana, 46802, a Ballot which will be supplied by the Court. In order for the Plan to be accepted by Ballot, Ballots of voting creditors who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of allowed claims of all Classes must be cast in favor of the acceptance of the Plan.

    NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY AS TO THEIR FUTURE BUSINESS OPERATIONS, VALUE OF PROPERTY, OR THE VALUE OF ANY PROMISSORY NOTE TO BE ISSUED UNDER THE PLAN) ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND/OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

    THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE RECORDS KEPT BY THE DEBTOR ARE DEPENDENT UPON INTERNAL ACCOUNTING PERFORMED BY THE DEBTOR. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.

## *B. General Information*

Essentially, the purpose of any reorganization or rehabilitation under chapter 11 is to preserve the assets of the Debtor and save it from disastrous or premature sales, such as at foreclosure, so that junior interests (junior mortgage holders and unsecured, general creditors, and Debtor) will receive the greatest possibility of preserving their right to recovery or equity in the Debtor's property. Plans of Reorganization providing for extensions of debt as a primary system of restructuring finances appear to be the most practical solution of the problem under chapter 11 of our present Bankruptcy Code.

There are limitations on what a debtor can do under a Chapter 11 Plan; primarily, a Plan may be confirmed over the objections of a Class of secured creditors only if the Court finds that those creditors are given fair and equitable treatment, and secured creditors must receive the "indubitable equivalent" of the value of their security. However, "indubitable equivalent" does not necessarily mean that secured creditors must receive payment right away; what it means is that the secured creditors, if they must wait, are entitled to a reasonable rate of interest on their money until they are paid. In other words, where a secured creditor is receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid, that creditor is receiving all the law requires, that is - full payment over a reasonable period of time. Under the new Bankruptcy Code, the term of any mortgage debt may be extended; payments required under the mortgage, of either principal or interest, may be postponed; and deferred or reduced payments of principal or interest may be added to the mortgage balance. Illustrative of this point is the case of In re Hollanger, 8 B.C.D. 365 (1981) involving farmers in which the Court allowed postponement of arrearages on mortgage debt for seven (7) years.

## *C. General Background*

Vision Investment Group, Inc. (sometimes hereinafter referred to as "Vision", "Debtor" and/or "Debtor-in-Possession") has its office headquarters located in Bluffton, Indiana. The company operates Subway® restaurants located in Indiana, Ohio and Michigan. At the commencement of the case, Debtor operated 32 store locations.

The store locations operated by the Debtor were acquired over time commencing with the acquisition of two stores in the summer of 1998. Debtor operates the store locations, but does not own the rights to the franchise – see Part I. Section H. - Franchise Ownership Structure below. Vision has, by assignment, the right to operate the Subway® stores, but is not the owner of the franchise rights for the stores. James ("Jim") Miller is the owner of the Subway® franchise rights to the stores. Mr. Miller is the president of the Debtor.

Debtor's financial difficulties result from several factors including decline in sales over a period of several years in conjunction with rising costs and lower net margins resulting from discounting programs. In the past approximately five years, Debtor experienced a decline in income as costs associated with coupon and discount programs as part of the franchise operations increased.

Faced with a decline in income and inability to maintain current payments on outstanding liabilities, Debtor sought relief under chapter 11 of the United States Bankruptcy Code.

### D. Commencement of the Chapter 11 Case

On May 11, 2018, Vision Investment Group, Inc. filed a Voluntary Petition Under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Indiana, Fort Wayne Division. Vision Investment Group, Inc. continues in possession of its property and manages its business as Debtor-in-Possession under §§1107 (Rights, powers and duties of debtor-in-possession) and 1108 (Authorization to operate business) of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtor's reorganization case. The Bankruptcy Court entered its Notice of Status as, and Obligations of, Debtor-in-Possession in Chapter 11 on May 14, 2018.

### E. Creditors' Committee

The office of the United States Trustee has not appointed an Unsecured Creditors' Committee.

### F. Retention of Professionals

At the commencement of the Debtor's reorganization case, the Debtor retained Daniel J. Skekloff and Scot T. Skekloff, as co-bankruptcy counsel, each of whom has been authorized to represent Vision Investment Group, Inc. as Debtor-in-Possession by Order Authorizing Employment of Attorney dated July 11, 2018. Additionally, on November 2, 2018, Debtor filed an Application to Employ Sandra Perry and Bose McKinney & Evans LLP as counsel for the purpose of advising and representing the Debtor on employment law matters which employment was authorized by Order entered December 7, 2018. Also on November 2, 2018, Debtor filed an Application to Employ David Cole and Haines, Isenbarger & Skiba, LLC to perform accounting services for the Debtor which employment was authorized by Order entered December 7, 2018.

### G. Pre-Petition Equity Security Holders

At the commencement of the case, Debtor submitted the following list of equity security holders:

| | |
|---|---|
| Becky Miller<br>0505 N. 100 W.<br>Bluffton, IN 46714 | 10% ownership interest |
| James E. Miller II<br>0505 N. 100 W.<br>Bluffton, IN 46714 | 90% ownership interest |

### *H. Affiliate Case*

Trinity Investment Group LLC ("Trinity Investment") is an affiliate of the Debtor as that term is defined in 11 U.S.C. § 101(2). The equity ownership of Trinity Investment is as follows:

| | |
|---|---|
| Vision Investment Group, Inc. | 81% |
| William Stose | 19% |

Trinity Investment filed for relief under chapter 11 of the United States Bankruptcy Code on April 13, 2018. The case is presently pending in the United States Bankruptcy Court, Northern District of Indiana, Fort Wayne Division, Case No. 18-10627.

### *I. Franchise Ownership Structure*

1.     The Subway Franchises. Debtor operates Subway® restaurants located in Indiana, Ohio and Michigan. However, Debtor does not own the franchise rights for the 32 Subway® stores that it presently operates, but rather has an assignment of the right to operate the stores. The franchisor, Doctor's Associates, Inc., the owner of the Subway® brand, allows franchisees to only be natural persons. However, the franchisor does allow and will authorize a business entity to be assigned the rights to operate a franchise store. Jim Miller, individually, acquired the franchise rights to the Subway® stores. Mr. Miller then, with the franchisor's approval, assigned the right to operate the stores to Vision Investment Group, Inc.

Accordingly, for each of the Subway® restaurant stores being operated by the Debtor, there is a separate Franchise Agreement between Doctors Associates, Inc. who is the Subway® Franchisor, and James E. Miller, II, as Franchisee. Mr. Miller is the franchisee in each Agreement for each of the 32 Vision operated stores because it is the policy of Subway that each of its franchisees be an individual and not a company or other organization. Pursuant to paragraph 9.B. of the franchise agreement, the Franchisee may, with Subway's consent, assign the right to operate the Subway franchise store, but only the right to operate. No other rights of the Franchise Agreement may be assigned.

Additionally, the stores from which the Subway® restaurants are operated are leased facilities. The tenant as to all stores operated by the Debtor is Subway Real Estate Corp., an entity unrelated to the Debtor that is affiliated with the franchisor, Doctor's Associates, Inc. Jim Miller, individually, is the sub-tenant as to each of the stores operated by the Debtor. Mr. Miller has authorized the Debtor to operate the stores at the leased locations. Debtor has filed a Motion to Assume Debtor's Interest in Real Estate Sublease with respect to each of the [32] store locations operated by the Debtor.

As noted, each of the 32 Subway® restaurant stores operated by the Debtor are on leased premises. In each case, as a requirement of Doctors Associates, Inc. (Subway), the Tenant must be Subway, or more specifically, Subway's affiliate, Subway Real Estate Corporation (SREC). SREC then in turn subleases the store to the franchisee. Accordingly, the subleasee must be an individual. For each of the Vision locations, James E. Miller, II is the Subtenant. Like the franchise agreements, the right to operate at subleased premises may be assigned with consent of Subway.

Accordingly, Doctors Associates, Inc. and SREC have consented to the assignment of (only) the right to operate the Subway® stores at the subleased premises. Such assignment does not, for example, assign the right to sell the sublease leasehold interest or to sub-sublease it.

    2.    <u>Value of a Subway® Store</u>. It is common to value a Subway® restaurant store as a going concern. Such going concern valuation is typically a multiple of the store's annual EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization). The multiple applied to EBITDA is typically based upon the level of annual gross sales. As such, value in operation is reflected in the going concern value much more than the value of the particular store's assets such as the equipment, leasehold improvements, inventory (both food and non-food items), accounts receivable and money in the cash register. These items, depending upon timing, age, and condition, might have a combined fair market value (FMV) of somewhere between $6,000.00 to $10,000.00 for any given store that the Debtor operates with such items expected to bring less in a liquidation considering short term sales and costs of liquidation. (Such items are assets of the Debtor in this case.) However, if sold as a going concern, including the franchise rights and location (sublease) rights, the price can be as much as $50,000.00, $70,000.00 or over $100,000.00 per store depending upon a particular store location's EBITDA and the applicable multiplier. This value assumes the sale of the store, with the full panoply of assets and rights associated with that store, including importantly, the franchise and location rights. In this case, as noted above, the franchisee and subleasee rights are owned by James E. Miller, II. Debtor's proposed Plan sets forth Mr. Miller's pledge to maintain his rights as a franchisee and subtenant for the operation of the Debtor as well as for any potential sale of the stores as a going concern. See Debtor's proposed Plan of Reorganization at Article V.

While the Debtor currently has an assignment of only the limited right to operate the franchises and location premises, the proposed Plan of Reorganization provides, as his significant contribution for the membership interest of the to-be-newly-reorganized Debtor, the pledge of James E. Miller, II to maintain and combine his franchisee and sublease rights for going concern purposes and including for a going concern sale of the stores should the Plan fail for any reason. The going concern sale value further ensures the ability of all Plan creditors to receive full Plan payments even in the event a sale were to become necessary. Conversely, if the Debtor were to liquidate and not reorganize, the liquidation value of the Debtor's assets is believed to be less than would be realized by unsecured creditors as proposed by Debtor's Plan. See Section II. Part C. Liquidation Analysis below.

### *J. Store Leases*

Debtor operates the stores from leased facilities; however, Debtor operates in the capacity as a sub-tenant as to each of the stores. As part of the operation of a Subway® franchise store, the franchisor requires that the lease of the store premises be initially entered into by Subway Real Estate Corp. Thereafter, Subway Real Estate Corp. subleases the premises for the operation of the franchise store. As it relates to the Debtor, the store leases from which the Debtor operates were ultimately assigned from the subtenant of Subway Real Estate Corp. to Jim Miller. The Debtor makes the monthly lease payments for each of the store locations as set forth and identified in the attached projections.

Debtor has filed Motions to Assume Debtor's Interest in Real Estate Sublease with respect to each of the 32 store locations. The store location and landlord information with respect to the stores operated by the Debtor is as follows:

| Location: | Landlord: |
|---|---|
| 113 W. Rochester, Akron, OH 46910 | Vantage Properties, LLC[1] |
| 901 North Ridge Road, Albion, IN 46701 | Michael Ceschin |
| 2016 North Wayne Street, Angola, IN 46703 | Twin Towers Management Trading Site Management, LLC |
| 1043 West 7th Street, Auburn, IN 46706 | Auburn Plaza, LLC |
| 203 Duesenberg Drive, Auburn, IN 46706 | MPT Auburn Plaza, LLP |
| 933 North Main Street, Bluffton, IN 46714 | Prime Realty Holdings, LLC |
| 2100 N. Main Street, Bluffton, IN 46714 | Twin Towers Management |
| 9197 A SR 101, Brookville, IN 47012 | J&B, LLC |
| 408 East Main Street, Cambridge City, IN 47327 | FBI Properties LLC |
| 416 Marshall Street, Coldwater, MI 49036 | B&W Fairfield Plaza Partnership |
| 409 East Chicago Street, Coldwater, MI 49036 | B.W.P. Leasing Services, LLC |
| 800 E. Chicago Street, Coldwater, MI 49036 | Twin Towers Management |
| 2170 North Park Road, Connersville, IN 47331 | White Water Center LLC |
| 503 West 3rd Street, Connersville, IN 47331 | Wiles, Inc. |
| 5035 Kay Bee Drive, Gas City, IN | Jupinder Petroleum, Inc. |
| 3955 E. Bellefontaine Rd., Hamilton, IN 46742 | Hamilton Gasoline Corp. |
| 1560 Main Street, Hamilton, OH 45013 | Meijer Stores Limited Partnership |
| 7150 Executive Blvd., Huber Heights, OH 45424 | Meijer Stores Limited Partnership |
| 14605 Lima Road, Fort Wayne, IN 46818 | Boyd Investment Corp. |
| 4 North Franklin Street, Knightstown, IN 46148 | VHA Limited Liability Company |
| 218 South Main Street, Liberty, IN 47353 | Vantage Properties, LLC |
| 101 E. US Hwy 6, Ligonier, IN 46767 | Tayla Hill |
| 552 Morse Street, Markle, IN 46770 | Verma Real Estate, LLC |
| 422 S. Washington Street, New Paris, OH 45347 | Vantage Properties, LLC |
| 228 East Main Street, North Manchester, IN 46962 | Mike McKinley |
| 2316 E. State Road 14, Rochester, IN 46975 | Baugo Creek Realty, LLC |
| 252 Kelly Street, Rome City, IN 46784 | KRDH, LLC |
| 1903 North Main Street, Rushville, IN 46173 | TDAK Development, Inc. |
| 127 S. State Street, South Whitley, IN 46787 | Michael Cotay |
| 15454 M-60, Tekonsha, MI 49092 | Vantage Properties, LLC |
| 550 Union Street, Waterloo, IN 46793 | Vantage Properties, LLC |
| 993 S. South Street, Wilmington, OH 45177 | King Commons, LLC |

---

[1] Vantage Properties LLC is owned 60% by Jim Miller and 40% by William Stose and is an insider of the Debtor as that term is defined by 11 U.S.C. §101(31).

### K. *Bridge Funding Group, Inc. Adversary Proceeding and Liens Information*

Bridge Funding Group, Inc. f/k/a United Capital Business Lending, Inc. ("Bridge Funding") filed a complaint (adversary proceeding #18-01038) seeking Bankruptcy Court determination of the extent, validity, and priority of Bridge Funding's asserted liens against the Debtor. Bridge Funding named as defendants in the lawsuit the Debtor, First Merchants Bank f/k/a iAB Bank f/k/a Markle Bank, U.S. Bank Equipment Finance, Corporation Service Company and The Coca Cola Company. In its complaint filed, Bridge Funding asserted that the identified defendants claiming a lien interest had liens that were subordinate and inferior to the lien of Bridge Funding except to the extent such liens were purchase money liens covering specific items of equipment and to the extent such purchase money liens were properly perfected, but excluding First Merchants Bank from such exception on account of a Subordination Agreement from First Merchants Bank in favor of Bridge Funding with respect to 29 stores owned by the Debtor.

During the pendency of the adversary proceeding certain parties have entered into stipulations with respect to lien priorities as follows:

As to The Coca-Cola Company ("TCCC"), Bridge Funding and TCCC agreed as follows:

> The lien asserted by Bridge is superior to any lien of TCCC, except (i) as to the outstanding balance owed to TCCC for certain specific dispensing equipment having an outstanding principal balance of $1,176.89 and (ii) rights and remedies of TCCC with respect to any setoff against the Debtor, also as described in detail in the Agreed Partial Final Judgment.

As to U.S. Bank Equipment Finance ("USBEF"), Bridge Funding and USBEF agreed as follows:

> The lien asserted by USBEF is superior to any lien of Bridge, except as to USBEF's purchase money security interest ("PMSI") as to Debtor's store number 38422 originally located at 170 Smartz Way, Auburn, IN and the collateral associated with that store number 38422 and limited to the outstanding balance owed to USBEF of $45,848.62.

As to Direct Capital Corporation ("DCC"), Bridge Funding and DCC agreed as follows:

> Bridge sued Corporation Service Company ("CSC") however, the correct party was Direct Capital and Direct Capital has agreed to be substituted herein in place of CSC and to the entry of relief as set forth in the Agreed Partial Final Judgment. Further, DCC and Bridge Funding stipulated as between Bridge and DCC that the liens asserted by DCC are superior to any lien of Bridge, limited to the outstanding balance owed to DCC of $25,574.47.

As to First Merchants Bank ("FMB"), Bridge Funding and FMB agreed as follows:

> As between Bridge and FMB, the lien asserted by Bridge is superior to any lien of FMB as to the collateral described in the Agreed Partial Final Judgment.

The adversary proceeding is presently pending as to remaining issues regarding the Debtor and the extent of the Bridge Funding asserted lien interests subject of the complaint filed.

By way of additional information, Debtor sets forth the following:

The equipment securing the claim of U.S. Bank d/b/a U.S. Bank Equipment Finance is no longer in the Debtor's possession. This store was closed pre-petition. The schedules valued the equipment securing the claim of U.S. Bank at $8,300.00. U.S. Bank asserts it has a value of $11,000 in its POC #4.

First Merchants Bank claims a security interest in all the Debtor's assets to secure the Debtor's guaranty of the Bank's mortgage loans to Vantage Properties LLC (the Landlord on five of the stores operated by the Debtor.) The Bank's claim is believed to be fully secured by Vantage Properties LLC real estate and all mortgage payments are current.

### *L. Synopsis of Tax Implication for Reorganization*

For income taxation purposes, Vision Investment Group, Inc., was treated as a pass-through entity such that the income and expenses thereof were reported on the 1120S return for the corporation. Schedule K-1 returns were issued to the shareholders. As such, prior to the commencement of the case, Debtor had no net operating losses (or "NOL's") that were available to it. As such, Debtor has been advised that the impact of Debtor's reorganization involves reduction of Debtor's future ability to recognize depreciation expense inasmuch as Debtor's tax basis in Assets of the reorganized Debtor is subject to reduction by the amount of actual discharged debt realized through the bankruptcy proceeding. As such, to the best of Debtor's current knowledge, information and belief, the impact of reorganization and any discharge of debt as may be provided under the proposed Chapter 11 Plan would be to reduce Debtor's tax basis of Assets, such reduction being no greater than the amount of Debtor's discharged debt through confirmation of the Chapter 11 Plan.

The Debtor's proposed Plan provides for the restructuring of the debt obligations of the Debtor with the potential for discharge of certain indebtedness existing at the commencement of the case. As such, the federal income tax consequences of the reorganization are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the Internal Revenue Service or an opinion of counsel concerning same.

By this statement, Debtor and Debtor's counsel are not and should not be construed to be rendering tax advice to any creditor, party in interest or recipient of this Disclosure Statement. Notwithstanding the foregoing, should anything contained herein be deemed to be now or at a later time tax advice, the following disclosure is made: To ensure compliance with the requirements

imposed by the Internal Revenue Service under Circular 230, Debtor informs you that any U.S. federal tax advice contained in this communication (including attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code, or (2) promoting, marketing or recommending to another party any matters addressed herein.

Accordingly, any person who may be affected by implementation of the Plan, including creditors and equity interest holders of the Debtor, should consult their own tax advisors with respect to and/or regarding the tax consequences under federal and any applicable state, local, commonwealth or foreign law.

### *M. Current (Post-Petition) Operations*

Vision Investment Group, Inc., has since the filing of the Petition, continued in its operation. Since the date of filing, Vision Investment Group, Inc., pursuant to operating reports filed, have had the following operating income and expenses from its operation:

**_May 2018 (11-31)_:**

| | |
|---|---|
| Total Income: | 729,957.26 |
| Total Cost of Goods Sold: | 229,326.98 |
| Gross Profit: | 500,630.28 |
| Total Expense: | 505,612.12 |
| Net Ordinary Income: | (4,981.84) |
| Total Other Income: | 265.23 |
| Net Income: | (4,716.61) |
| | |
| Total Receipts: | 739,686.55 |
| Total Disbursements: | 470,421.10 |
| Net Cash Flow: | 269,265.45 |

**_June 2018_:**

| | |
|---|---|
| Total Income: | 931,767.71 |
| Total Cost of Goods Sold: | 313,814.93 |
| Gross Profit: | 617,952.78 |
| Total Expense: | 620,641.91 |
| Net Ordinary Income: | (2,689.13) |
| Total Other Income: | 367.84 |
| Net Income: | (2,321.29) |
| | |
| Total Receipts: | 1,079,817.60 |
| Total Disbursements: | 1,108,693.48 |
| Net Cash Flow: | (28,875.88) |

**_July 2018_:**

| | |
|---|---:|
| Total Income: | 989,670.95 |
| Total Cost of Goods Sold: | 320,176.50 |
| Gross Profit: | 669,494.45 |
| Total Expense: | 687,199.67 |
| Net Ordinary Income: | (17,705.22) |
| Total Other Income: | 255.29 |
| Total Other Expense: | 200.00 |
| Net Income: | (17,649.93) |
| | |
| Total Receipts: | 1,081,347.59 |
| Total Disbursements: | 1,049,955.22 |
| Net Cash Flow: | 31,392.37 |

**_August 2018_:**

| | |
|---|---:|
| Total Income: | 1,015,616.22 |
| Total Cost of Goods Sold: | 299,837.41 |
| Gross Profit: | 715,323.81 |
| Total Expense: | 710,336.89 |
| Net Ordinary Income: | 4,986.92 |
| Total Other Income: | 287.49 |
| Net Income: | 5,274.41 |
| | |
| Total Receipts: | 1,061,310.81 |
| Total Disbursements: | 969,701.31 |
| Net Cash Flow: | 91,609.50 |

**_September 2018_:**

| | |
|---|---:|
| Total Income: | 954,932.25 |
| Total Cost of Goods Sold: | 286,758.71 |
| Gross Profit: | 668,173.54 |
| Total Expense: | 641,934.31 |
| Net Ordinary Income: | 26,239.23 |
| Total Other Income: | 457.99 |
| Net Income: | 26,697.22 |
| | |
| Total Receipts: | 966,749.54 |
| Total Disbursements: | 962,762.38 |
| Net Cash Flow: | 3,987.16 |

**_October 2018_:**

| | |
|---|---:|
| Total Income: | 946,677.52 |
| Total Cost of Goods Sold: | 313,449.04 |
| Gross Profit: | 633,228.48 |
| Total Expense: | 721,512.15 |
| Net Ordinary Income: | (88,283.67) |

| | |
|---|---:|
| Net Other Income: | 82.08 |
| Net Income: | (88,201.59) |
| | |
| Total Receipts: | 1,099,037.58 |
| Total Disbursements: | 1,054,339.78 |
| Net Cash Flow: | 44,697.80 |

**_November 2018_:**

| | |
|---|---:|
| Total Income: | 822,499.81 |
| Total Cost of Goods Sold: | 262,655.03 |
| Gross Profit: | 559,844.78 |
| Total Expense: | 586,461.03 |
| Net Ordinary Income: | (26,616.25) |
| Net Other Income: | 3,777.28 |
| Net Income: | (22,838.97) |
| | |
| Total Receipts: | 862,744.52 |
| Total Disbursements: | 1,071,128.01 |
| Net Cash Flow: | (208,383.49) |

**_December 2018_:**

| | |
|---|---:|
| Total Income: | 889,997.38 |
| Total Cost of Goods Sold: | 156,077.60 |
| Gross Profit: | 733,919.78 |
| Total Expense: | 594,950.77 |
| Net Ordinary Income: | 138,969.01 |
| Net Other Income: | 803.13 |
| Net Income: | 139,772.14 |
| | |
| Total Receipts: | 932,603.38 |
| Total Disbursements: | 818,923.36 |
| Net Cash Flow: | 113,680.02 |

## II.

### _Debts and Assets Analysis_

### _A. Assets_

1.   Real Estate:

The Debtor owns the following parcels of real estate: None.

2.   Personal Property:

The amounts listed in Schedule "B" of the Schedules of Assets and Liabilities (filed June 6, 2018) were accurate to the best of the Debtor's knowledge. Accordingly, the Debtor's personal property at the time of the Chapter 11 filing had a value as follows:

| | |
|---|---:|
| Cash on hand (estimate) | 12,000.00 |
| Cash on hand at multiple (14) banks (estimate) | 177,515.26 |
| Various utility deposits at 33 stores (Balance Sheet as of 03/20/18) | 25,455.30 |
| Accounts Receivable | |
| 90 days or less | 1,665.95 |
| 90 days or less doubtful accounts | 224,108.78 |
| 90 days or less doubtful accounts | 2,413,599.34 |
| Intercompany Account = A/R Vantage Properties (Balance Sheet as of 03/20/18) | 0.00 |
| Stockholder Receivable | 0.00 |
| Non-publicly traded stock & business interests, Corp, LLC, Partnership: | |
| Trinity Investment Group LLC | |
| Bluffton, IN 46714 | |
| Percentage Ownership: 81% | 0.00 |
| Food and products inventory - from Balance Sheet | |
| Perishable, Purchased within 20 days of filing | 181,506.24 |
| (10) iPads, (3) iPods | 1,298.85 |
| 2015 Cadillac Escalade (VIN Ending 0193) | 54,661.80 |
| Fixed Assets = Equipment & Fixtures [$220,336.78], Leasehold Improvements [$1,385,143.00] (Balance Sheet as of 03/20/18) | 112,000.00 |
| Internet domain names and websites: | |
| Viginc.net | 0.00 |
| Goodwill ($91,443) + Franchise Fees ($21,125) + Loan Costs ($17,010) From Balance Sheet as of 03/20/18 | 0.00 |
| Key-man Life Insurance Policies | 0.00 |
| Investment in Trinity Investment Group LLC (Value: -$2,327,796.62) (Balance Sheet as of 03/20/18). | 0.00 |
| TOTAL: | $3,203,811.52 |

### B. Debts

The following information is a summary of the Debtor's debt obligations pursuant to information as set forth in the Schedules filed in the case. These amounts are presented as an indication of the Debtor's financial status as of the commencement of the case.

1.    Secured Creditors:

The following is the creditor scheduled by the Debtor claiming security interests (secured in whole or in part) and the estimated amount of the claim:

BB&T Commercial Equipment Capital (Susquehanna) / Branch
Banking & Trust Company (pursuant to Proof of Claim 5)
    Note: Debtor scheduled the claim referencing
    Tekonsha, MI store equipment and leasehold
    improvements)                   15,662.94

Bridge Funding Group, Inc. (pursuant to Proof of Claim 13)
    Note: see p. 6 above regarding lien priority
    information                   1,274,655.36

Corporation Service Company, as Rep.
    Note: Scheduled for notice purposes, no proof of
    claim filed, this claim has been asserted by Direct
    Capital                   0.00

Direct Capital (pursuant to Proof of Claim 3)
    Note: Debtor scheduled the lien as to 31
    Point of Sale Systems & All Assets       25,574.57

First Merchants Bank (pursuant to Proof of Claim 16)
    Note: Debtor scheduled the lien as to All Assets    766,475.41

GM Financial (dba of Americredit Financial Services, Inc.)
(pursuant to Proof of Claim 9)
    2015 Cadillac Escalade (VIN Ending 0193)    50,059.09

On Deck Capital, Inc. (pursuant to Proof of Claim 1)
    Note: Debtor scheduled the lien as inferior to all
    other liens asserting therefore it has no value    280,870.12

The Coca-Cola Company
    Note: Debtor scheduled on account of dispensing
    equipment purchased some years ago      650.00

U.S. Bank Equipment Finance (pursuant to Proof of Claim 4)
    Note: Debtor scheduled referencing Auburn 3, IN
    store equipment and leasehold improvements;
    Secured amount $11,000 per POC      45,848.62

United Capital Business Lending
    Note: Debtor scheduled for Notice purposes; no
    proof of claim filed             0.00

Wells Fargo Vendor FIN SE (pursuant to Proof of Claim 14)
    Note: Debtor scheduled collateral as (10) iPads, (3)
    iPods                   822.74

Western Equipment Finance
    Note: Debtor scheduled claim as related to
    Rochester, IN store equipment and leasehold
    improvements              31,646.18

Additionally, the following creditors have also filed a proof of claim asserting secured claims:

Ford Motor Credit Company, LLC (Proof of Claim 2)
     Claim is for 2017 pick-up truck lease       17,336.12
Deere & Company (Proof of Claim 11)
     Claim secured by lawn mower         4,526.00

    2.      Unsecured Creditors:

    All creditors of the Debtor not listed above are considered unsecured. The total of all claims listed by the Debtor in its Schedule "F" filed June 6, 2018, as unsecured is $967,184.44.

    3.      Priority Claims:

    Pursuant to proofs of claim filed, the following are priority claims asserted:

Internal Revenue Service (Proof of Claim 6)     $22,827.13
Ohio Department of Taxation (Proof of Claim 12)  $800.09
Wells County Treasurer (Proof of Claim 10)    $364.77

    It is expected that there will be some adjustment to these amounts when exact amounts of claims become known.

### *C. Liquidation Analysis*

    The Liquidation Analysis is provided for a comparison of what creditors would receive in a chapter 7 liquidation as opposed to what is provided under the proposed Chapter 11 Plan. In a liquidation, secured creditors are entitled to distribution from proceeds of their collateral prior to distribution to other creditors.

Real Estate:

    The Debtor owns no real estate. All of the locations from which the stores are operated are leased.

Personal Property:

    Debtor scheduled ownership of personal property that may be classified as follows:

    a.     Cash, Bank Accounts, Accounts Receivable, Utility Deposits
    b.     Food Inventory
    c.     Equipment and Fixtures
    d.     Franchise Fee, Goodwill and Other Intangibles
    e.     Stockholder Receivable and Intercompany Account
    f.     Vehicle
    g.     Life Insurance Policy

a.    Cash, Bank Accounts, Accounts Receivable, Utility Deposits.

Debtor scheduled assets including cash, bank accounts, other accounts and utility deposits as follows:

| | | |
|---|---|---:|
| Cash on hand | | 12,000.00 |
| Bank accounts | | 177,515.26 |
| Various utility deposits at 32 stores | | 25,455.30 |
| Accounts Receivable balance | | 1,665.95 |
| | TOTAL: | 216,636.51 |

In a hypothetical liquidation, the proceeds of the Cash, Bank Accounts, Other Accounts and Utility Deposits would be available for distribution to creditors provided, however, secured creditors including Bridge Funding Group and First Merchants Bank assert, generally, a lien on assets of the Debtor including intangible assets and accounts as well as proceeds from the sale of assets upon which those creditors assert a lien. Proceeds from the sale of inventory for bankruptcy purposes is defined as cash collateral. Bridge Funding Group and First Merchants Bank both assert a lien on cash collateral assets of the Debtor with Bridge Funding maintaining a first priority lien thereon.

Debtor scheduled doubtful or uncollectible accounts of 224,108.78 and 2,413,599.34. The 224,108.78 amount results from bookkeeping entries involving the affiliate entity, Vantage Properties, LLC that owns certain real estate leased by the Debtor, Section I. Part J. Store Leases above. The receivable entry amount was generated over time concerning proposed apportionment of expenses between Vision Investment and Vantage Properties, LLC for expenses paid by Vision Investment related to Vantage Properties, LLC including such items as insurance, apportionment of accountant fees and other expenses. Additionally, the bookkeeping entries resulting in this indicated receivable include entries regarding Vantage Properties, LLC payments to Vision Investment regarding loans obtained in the purchase of real estate. As of November 19, 2018, the Debtor's records indicate a balance on the account receivable of $235,057.29. Vantage Properties, LLC has income from lease payments from the Debtor sufficient to make required payments including on mortgage indebtedness, but it has minimal cash flow beyond that necessary to stay current on mortgage indebtedness and related operating expenses. In addition, pursuant to the October 31, 2018 balance sheet of Vantage Properties, LLC, that entity had total assets of $1,428,875.91 (relating to the five parcels of real estate owned) and total liabilities of $1,624,424.53. As such, given the lack of payment ability of this affiliate entity, Debtor scheduled the indicated account receivable regarding Vantage Properties, LLC as having no value. Accordingly, as an entry reflected on the Debtor's books at the time of the commencement of the case, Debtor set forth such information for disclosure purposes, but noted such item as doubtful or uncollectible account in the schedules filed.

Similarly, Debtor scheduled a receivable in the amount of $2,413,599.34 as an uncollectible or doubtful account. This receivable resulted from bookkeeping entries over the years concerning allocation of expenses to Debtor's principal, Jim Miller. Debtor set forth this information as it was shown as a receivable entry on Debtor's books, but is a doubtful or uncollectible account. Jim Miller has liabilities associated with debts of both the Debtor and the

affiliate chapter 11 debtor, Trinity Investment Group, LLC. Jim Miller is accordingly insolvent and not believed collectible.

Further, the utility deposits are held by the utilities companies with which the Debtor utilizes services for its operations and are in their possession. In a hypothetical liquidation, those utility deposits would be subject to set-off for outstanding balances owed at such time and accordingly, Debtor believes would be of nominal value. Further, as noted, the accounts receivable and intangible assets of the Debtor are subject to a claim of lien by Bridge Funding Group and First Merchants Bank. Bridge Funding asserts a first priority lien on the assets of the Debtor securing its claim of approximately $1,274,655. Accordingly, in a hypothetical liquidation, Debtor sets forth that there would be no proceeds available from the Cash, Bank Accounts, Accounts Receivable and Utility Deposits for distribution to unsecured creditors.

b.    Food Inventory.

Debtor scheduled food inventory with a value of $181,506.24. In its operation, Debtor maintains just sufficient inventory to daily operate its 32 stores. The food inventory was scheduled with a value at cost. As with the cash and accounts, the food inventory is subject to liens asserted by Bridge Funding Group and First Merchants Bank. However, in a hypothetical liquidation, Debtor sets forth it would not be able to maintain necessary operations for the Subway® franchise stores to allow the sale of existing inventory such that in a liquidation, Debtor does not believe the food inventory would result in liquidation proceeds for creditors and may result in additional liquidation expense associated with any required disposal of remaining, unused food inventory.

c.    Equipment and Fixtures.

Debtor scheduled equipment and fixtures with a scheduled value of $112,000.00 together with 10 iPads and 3 iPods with a scheduled value of $1,298.35. This value was based upon Debtor's opinion of value if the property were to be removed from the stores for sale. Debtor also based this value on the assertion that, because of the markings on the equipment, as well as the specific intended use, it is likely the equipment and fixtures could only be marketed and sold to the operator of a Subway® franchise store. Debtor also considered the age and condition of the equipment in its valuation. The schedules filed also note the book value of the equipment with information referenced as follows:

| | | |
|---|---|---|
| Equipment & Fixtures | $220,336.78 | book value |
| Leasehold Improvements | $1,385,143.00 | book value |

Debtor set forth this information for disclosure purposes and maintains such values reflect acquisition cost and expense incurred in such acquisition and installation of improvements and fixtures. Debtor maintains that the actual sale value, if the equipment had to be sold, would be much closer to the scheduled value of $112,000.00 for the used equipment and fixtures than the book value thereof. In a hypothetical liquidation, the proceeds (less costs of liquidation) would go to Bridge Funding Group on its blanket first priority lien subject to purchase money security interest liens for certain equipment held by The Coca Cola Company and U.S. Bank Equipment Finance as referenced above – see Section I. Part K. Bridge Funding Group, Inc. Adversary

Proceeding and Liens Information. As such, in a liquidation, Debtor maintains that there would be no proceeds in liquidation of the equipment and fixtures available for distribution to unsecured creditors.

d.    Franchise Fee, Goodwill and Other Intangibles.

Debtor scheduled Goodwill, Franchise Fee and Loan Costs with a value of unknown. Debtor scheduled these items as they are reflected on the prepetition balance sheet of the Debtor and for disclosure purposes were identified in the schedules with book values as follows:

| Goodwill | $91,443.00 |
| Franchise Fee | $21,125.00 |
| Loan Costs | $17,010.00 |

These items were reflected in Debtor's books resulting from expenses incurred by the Debtor as part of the acquisition of operating assets and loan proceeds for funding of operations of the Debtor. The Franchise Fee represents an amount advanced by the company on behalf of Jim Miller and is, in effect, a receivable from Jim Miller. In a hypothetical liquidation, the franchise fee expenses and loan costs booked by the Debtor would not constitute saleable assets. The goodwill would be encompassed in a sale of the Subway® stores if the stores were sold as a going concern. As above identified, the Debtor does not own the franchise rights for the stores that are operated by the Debtor. The franchise rights to each of the 32 stores belong to Jim Miller individually in compliance with the franchisor requirement that the franchise rights for a Subway® store must be owned by a natural person. Debtor has only an assignment of the right to operate the stores. Accordingly, in a hypothetical liquidation, sale of the right to operate the stores would, Debtor believes, be difficult to achieve inasmuch as the actual franchise rights belong to Jim Miller individually. In the absence of the sale of the franchise rights that are owned by Jim Miller individually, Debtor believes the right to operate only that the Debtor has would likely have little value in the event of a hypothetical liquidation.

e.    Stockholder Receivable and Intercompany Account, Investment in Trinity Investment Group LLC, and Trinity Investment Ownership Interest.

Debtor scheduled additional referenced items upon its records to disclose balance sheet assets shown by the Debtor as follows:

| Intercompany Account – A/R Vantage Properties (balance sheet as of 03/20/18) | 0.00 |
| Stockholder Receivable | 0.00 |
| Non-publicly traded stock regarding Trinity Investment Group LLC | 0.00 |
| Investment in Trinity Investment Group LLC (value - $2,327,796.62 balance sheet as of 03/20/18) | 0.00 |

Each of the above entries concern transactions and/or investment in Trinity Investment Group LLC and result from bookkeeping entries concerning intercompany transactions including loans regarding that affiliate of the Debtor. These intercompany transactions are identified in accounts information dating from 2016 through April 2018. The majority of the transactions

concern allocation of expenses among common vendors by and between the Debtor and Trinity Investment and does also include entries for allocation of administrative wages and expenses between the companies. Trinity Investment Group LLC has filed its own chapter 11 case. As such, Debtor valued these items at zero based upon the insolvency of Trinity Investment. Accordingly, in a hypothetical liquidation, Debtor believes that the receivable items regarding Trinity Investment would not result in proceeds available for payment to creditors.

f.    Vehicle.

Debtor scheduled a 2015 Cadillac Escalade vehicle with a scheduled value of $54,661.80 based upon its mileage, age and condition and potential resale value. This vehicle is subject to the lien of GM Financial in the amount of $50,059.09. Accordingly, in a hypothetical liquidation, the proceeds from the sale of the vehicle would be paid to the secured creditor, GM Financial on account of its lien interest. Considering costs associated with sale, Debtor does not believe there would likely be proceeds in liquidation over and above the amount of the secured claim and as such there would be no proceeds available for distribution to unsecured creditors.

g.    Life Insurance Policies.

Debtor scheduled a Key-man Life Insurance policies with a value of 0.00. These life insurance policies owed by the Debtor consist of the following:

(1.)    Key Person Term Smart policy, Vision Investment Group owner
Insured: James E. Miller II ("Jim Miller")
Primary Beneficiary: Vision Investment Group
Net Death Benefit: 5,000,000.00
Term policy – no cash value

(2.)    Key Person Term Smart policy, Vision Investment Group owner
Insured: Joni M. Lehman
Primary Beneficiary: Vision Investment Group
Net Death Benefit: 420,000.00
Term policy – no cash value

(3.)    Key Person Term Smart policy, Vision Investment Group owner
Insured: Bruce W. Miller
Primary Beneficiary: Vision Investment Group
Net Death Benefit: 3,000,000.00
Term policy – no cash value

(4.)    Key Person Term Smart policy, Vision Investment Group owner
Insured: William R. Stose
Primary Beneficiary: Vision Investment Group
Net Death Benefit: 1,300,000.00
Term policy – no cash value

As term policies, Debtor scheduled these interests in life insurance policies with a zero cash value.

Summary:

As above identified, those assets scheduled by the Debtor with a value in liquidation are encumbered by liens securing claims in excess of proceeds that may be realized from the sale of those assets in a hypothetical liquidation. Accordingly, Debtor sets forth that in a hypothetical liquidation, there would be no proceeds available for payment to unsecured claims.

In a liquidation, certain claims are entitled to priority prior to distribution to general unsecured creditors. These claims consist of administrative and priority claims pursuant to the priorities set forth in the Bankruptcy Code.

Administrative Expenses: Certain entities including Debtor's attorneys, accountants, appraisers, or other professionals authorized to be employed by the Debtor and professionals employed by the Unsecured Creditors' Committee, if any, may file Applications with the Bankruptcy Court for the allowance of compensation and reimbursement of expenses. Requests for compensation are subject to approval by the Bankruptcy Court after a hearing on notice at which the Debtor and other parties in interest may participate and, if appropriate, object to the allowance of any compensation and reimbursement of expenses. Attorney fees are not known at present, but are estimated to be $180,000.00 at Confirmation. Accountancy fees are not know at present, but are estimated to be $15,000.00 at Confirmation. These amount may be greater or lesser depending upon matters involved in the chapter 11 proceeding, including issues relating to claims and the confirmation of the Plan. Additional administrative expenses would include U.S. Trustee fees unsatisfied at the time of the Plan Confirmation, which at this time are estimated to be approximately $30,000.00. U.S. Trustee fees continue to accrue until the case is closed.

Priority Claims: Certain claims, including certain government taxing authority claims are entitled to a priority position over general unsecured creditors. The Bankruptcy Code requires payment of these priority claims before distribution to general unsecured creditors or interest holders. Proofs of Claim filed to date indicate total priority claims asserted totaling $23,991.99.

Administrative and priority claims (if any) would be entitled to payment prior to payment to general unsecured creditors.

Accordingly, Debtor sets forth that in a hypothetical liquidation, the total proceeds available for payment to general unsecured creditors represents an amount less than as proposed to be paid to unsecured creditors under Debtor's chapter 11 plan.

### *D. Projections*

The Debtor has in accordance with its experience and expertise, formulated projections of income and expenses for the continued operation of the corporation.

These projections, based upon the Debtor's most current information reflect the present opinion of the income to be generated by the operation of Vision Investment Group, Inc., as well as the costs and expenses associated with its operation.

The projections, attached hereto as **Exhibit A**, provide information on the continued operation of the Debtor based upon its experience and current information and opinion regarding anticipated sales income and expenses from the operation of the business. It is cautioned that no representation can be made with respect to the accuracy of these projections or the ability to achieve the projected results. Certain of the business assumptions used in the preparation of the projections may not materialize. The conclusions described herein are subject to numerous assumptions regarding future sales, costs of supplies and expenses associated with the operation of the business. Moreover, unanticipated and uncontrollable events and circumstances may occur after the date of the forecast which would affect the business and operation of Vision Investment Group, Inc. Accordingly, although the Debtor believes that these projected results are achievable, actual results achieved during the period covered by the projections will undoubtedly vary from the projections and such variations may be material. The financial information set forth herewith should be reviewed in conjunction with other information regarding the Debtor's business and operation and with such other information contained elsewhere in this Disclosure Statement.

## III.

### _Bankruptcy Code Requirements for Confirmation_

The Bankruptcy Court will confirm the Plan only if it finds that all of the requirements of §1129 (Confirmation of plan) of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the Plan: (i) is accepted by all impaired classes of claims and equity interests, or if rejected or deemed rejected by an impaired Class, satisfies the "cramdown" standard; (ii) is feasible; and (iii) is in the "best interests" of creditors and stockholders (interest holders) impaired under the Plan.

Section 1129 of the Bankruptcy Code which sets forth the requirements that must be satisfied in order for the Plan to be confirmed, lists the following requirements for the approval of any plan of reorganization:

1. A plan must comply with the applicable provisions of the Bankruptcy Code.

2. The proponent of a plan must comply with the applicable provisions of the Bankruptcy Code.

3. A plan must be proposed in good faith and not by any means forbidden by law.

4. Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with such plan and incident to the case, must be approved by, or be subject

to the approval of, the court as reasonable.

5.     (i)(A)   The proponent of a plan must disclose the identity and affiliations of any individual proposed to serve, after confirmation of such plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan and the Debtor, or a successor to the Debtor under such plan; and

       (B)      The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy; and

       (ii)     The proponent of a plan must disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for each insider.

6.     Any governmental, regulatory commission with jurisdiction, after confirmation of a plan, over the rates of the debtor must approve any rate change provided for in such plan, or such rate change is expressly conditioned on such approval.

7.     Each holder of a claim or interest in an impaired class of claims or interests must have accepted the plan or must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date, or, if the class is a class of secured claims that elects non-recourse treatment of the claims under §1111(b) of the Bankruptcy Code (§1111 is entitled "Claims and interests"), each holder of a claim in such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. This is the so-called "best interests" test.

8.     With respect to each class of claims or interests, such class must accept the plan or not be impaired under the plan (subject to the "cramdown" provisions discussed herein.)

9.     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, a plan must provide that:

       (i)      with respect to an administrative claim and certain claims arising in an involuntary case, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of the claim;

    (ii)    with respect to a class of priority wage, employee benefit, consumer deposit and certain other claims described in §507(a)(3)-(6) of the Bankruptcy Code (§507 is entitled "Priorities"), each holder of a claim of such class will receive

        (A)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

        (B)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

    (iii)    with respect to a priority tax claim of a kind specified in §507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding five (5) years after the date of the order for relief, of a value, as of the date of assessment of such claim of a value, as of the effective date of the plan equal to the allowed amount of such claim, and such treatment must be in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plain (other than cash payments made to a class of creditors under §1122(b)). (§1122 is entitled "Classification of Claims or interests")

10.    If a class of claims is impaired under a plan, at least one class of claims that is impaired under such plan must have accepted the plan, determined without including any acceptance of the plan by any insider; except that in a case in which the debtor is an individual, the debtor may retain property included in the estate subject to the requirements of 11 U.S.C. §1129(a)(14) described in ¶15 below.

11.    Confirmation of a plan must not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan unless such liquidation or reorganization is proposed in the plan. This is the so-called "feasibility" requirement.

12.    All fees payable under §330 of the Bankruptcy Code, as determined by the court at the hearing on confirmation of the plan, must have been paid or the plan must provide for the payment of all such fees on the effective date of the plan.

13.    A plan must provide for the continuation after its effective date of payment of all retiree benefits, as that term is defined in §1114 (Payment of insurance benefits to retired employees) of the Bankruptcy Code, at the level established pursuant to either subsection (e)(1)(B) or (g) of §1114 of the

Bankruptcy Code, at any time prior to confirmation of such plan, for the duration of the period the debtor has obligated itself to provide such benefits.

14.    An individual debtor may not obtain confirmation unless post-petition domestic support obligations are paid in full.

15.    In those chapter 11 cases in which the debtor is an individual, and in which the holder of an allowed unsecured claim objects to the confirmation of the Plan, the court will confirm the Plan only if the value, as of the effective date of the Plan, of the property to be distributed under the Plan on account of such claim is not less than the amount of such claim; or the value of the property to be distributed under the Plan is not less than the projected disposable income of the debtor (as defined in 11 U.S.C. §1325(b)(2) to be received during the five (5) year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

This Disclosure Statement discusses three of these requirements: (a) the feasibility of the Plan; (b) acceptance by impaired classes; and (c) the "best interests" standard. The Debtor believes that the Plan meets all the requirements of §1129(a) of the Bankruptcy Code (other than as to voting, which has not taken place) and will seek a ruling of the Court to this effect at the hearing on confirmation of the Plan. You are urged to consult your own attorneys to evaluate each of the standards for confirmation of the Plan under the Bankruptcy Code.

### _Vote Required for Acceptance; Confirmation_

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class which actually cast ballots (other than any holders who are found by the Bankruptcy Court to have cast their ballots in bad faith). The Bankruptcy Code defines acceptance of a plan by an impaired class of equity interests as acceptance by holders of at least two-thirds in number of the equity interests of that class that actually cast ballots other than any holders who are found by the Bankruptcy Court to have cast their ballots in bad faith.

In addition to this voting requirement, §1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or interest in an impaired class or that the plan otherwise be found by the Court to be in the best interests of each holder of a claim or interest in an impaired class. See "Best Interests Test" below.

If one Class of impaired Claims or Interests accepts the Plan, the Court may confirm the Plan under the "cramdown" provisions of §1129(b) of the Bankruptcy Code, which permits the confirmation of a plan over the dissenting votes of creditors or equity interest holders that have voted, as a Class, to reject the plan, provided that certain standards are met. See "Cramdown" below.

In the event any Voting Class votes against the Plan, and the Plan is not withdrawn, the terms of the Plan may be modified by the Debtor, as necessary to effect a "cramdown" on such dissenting Class or Classes by reallocating value from all Classes Junior to the objecting Class or Classes to any impaired senior Classes until such impaired senior Classes are paid in accordance with the absolute priority rule of §1129(b) of the Bankruptcy Code. Any such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice of the hearing on the confirmation of the affected Plan. Subject to the conditions set forth in the Plan, a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to §1129 of the Bankruptcy Code will not limit or affect the Debtor's ability to modify the Plan to satisfy the provisions of §1129 of the Bankruptcy Code.

### ***Best Interests Test***

Notwithstanding acceptance of the Plan by each impaired Class, in order to confirm the Plan the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest that has not accepted the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test of §1129(a)(7) of the Bankruptcy Code requires that the Court find that the Plan provides to each Holder of a claim or interest in such impaired Class a recovery on account of the Holder's Claim or Interest that has a value of at least equal to the value of the Distribution that each such Holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtor were liquidated in a chapter 7 case, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Debtor's case were converted to a chapter 7 liquidation by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by the Cash held by the Debtor and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case including sale costs. Debtor believes that a chapter 7 liquidation would have a material and adverse effect upon the values which would be received by its creditors when measured against such values assuming consummation of the Plan.

The Liquidation Value available to general creditor would be reduced by: (a) the Claims of secured creditors to the extent of the value of their collateral; and (b) the costs and expenses of the liquidation under chapter 7, which would include: (i) the compensation of a trustee and its counsel and other professionals retained; (ii) disposition expenses; (iii) all unpaid expenses incurred by the Debtor during its Reorganization Case (such as compensation for attorneys, auctioneers and accountants) which are allowed in the chapter 7 case; (iv) litigation costs; and (v) Claims arising from the operation of the Debtor during the pendency of the chapter 11 and chapter 7 liquidation cases. The liquidation itself would cause the realization of additional Priority Claims and would accelerate other priority payments which would otherwise be payable in the ordinary course. These Priority Claims would be paid in full out of the liquidation proceeds before the balance would be made available to pay most other Claims or to make any Distribution in respect of Interests. A discussion concerning liquidation of the Debtor's assets is set forth above, See II.C. Liquidation Analysis.

Once the percentage liquidation recoveries for each Class are ascertained, the value of the Distribution available out of the Liquidation Value is compared with the value of the property offered to such Class under the Plan to determine if it is in the best interests of Holders of Allowed Claims or Allowed Interests, as the case may be, in such Class.

After considering the effect that a chapter 7 liquidation would have on the value of the Debtor, including the costs of an Claims resulting from a chapter 7 liquidation, the adverse effect of a forced sale on the prices of the Debtor's assets, the potentially adverse impact on the Debtor's business and the delay in the distribution of liquidation proceeds, the Debtor has determined estimated Liquidation Values for its Reorganization Case, which are set forth above. Based on the analysis set forth therein, and subject to the assumptions and qualifications therein expressed, the Debtor believes that the Plan as proposed herein satisfies the requirements of the "best interests" test of §1129(a)(7) of the Bankruptcy Code.

### *Fair and Equitable Test; Cramdown*

Any Voting Class that fails to accept the Plan will be deemed to have rejected the Plan. Notwithstanding such rejections, the Bankruptcy Court may confirm the Plan and the Plan will be binding upon all Classes, including the Classes rejecting the Plan, if the Debtor demonstrates to the Bankruptcy Court that at least one impaired Class of Claims has accepted the Plan and that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Class. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to for its claims or interests.

The Bankruptcy Code establishes different "fair and equitable" tests for the secured and unsecured creditors as follows:

1.  Secured Creditors. Either (i) each secured creditor in a non-accepting impaired class retains the liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each secured creditor in a non-accepting impaired class realizes the indubitable equivalent of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

2.  Unsecured Creditors. Either (i) each unsecured creditor in a non-accepting impaired class receives or retains under the plan property having a present value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the Plan, unless new value is given by and through the operation of the Chapter 11 Plan; additionally, with respect to those cases in which the Debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the Plan, the

court will confirm the Plan only if the value, as of the effective date of the Plan, of the property to be distributed under the Plan on account of such claim is not less than the amount of such claim; or the value of the property to be distributed under the Plan is not less than the projected disposable income of the debtor (as defined in 11 U.S.C. §1325(b)(2) to be received during the five (5) year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer.

THE DEBTOR BELIEVES THAT THE PLAN DOES NOT DISCRIMINATE UNFAIRLY WITH RESPECT TO ANY CLASS AND IS FAIR AND EQUITABLE WITH RESPECT TO EACH IMPAIRED CLASS, THEREFORE, THE DEBTOR INTENDS TO SEEK CONFIRMATION OF THE PLAN EVEN IF LESS THAN THE REQUISITE NUMBER OF FAVORABLE VOTES ARE OBTAINED FROM ANY VOTING CLASS.

### *Feasibility*

The Bankruptcy Code requires that the Bankruptcy Court, in order to confirm the Plan must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"). For the Plan to meet the Feasibility Test, the Bankruptcy Court must find that reorganized Debtor, subsequent to the Effective Date, will have a reasonable expectation of generating, through their own operations or access to sources of debt and/or equity capital, funds sufficient to satisfy their obligations under the Plan and otherwise.

Assuming consummation of the Plan substantially as described herein, the Debtor believes that the Plan meets the requirements of the Feasibility Test. The Debtor has prepared projections of the expected operating and financial results of reorganized Debtor for a period of three (3) years. Based on those projections, Debtor believes that the Plan complies with the financial feasibility standard for confirmation. The Debtor believes the results set forth in these projections are attainable and that it will have sufficient funds to meet its obligations under the Plan and otherwise.

The Debtor cautions that no representations can be made with respect to the accuracy of these projections or the ability to achieve the projected results. Certain of the business assumptions used in the preparation of the Projections may not materialize. The conclusions described herein are subject to numerous assumptions regarding continuing operations, many of which are the subject of continuing review and modification. Moreover, unanticipated and uncontrollable events and circumstances may occur after the date of the forecasts which could affect the business and property. Accordingly, although the Debtor believes that these projected results are achievable, actual results achieved during the period covered by the Projections will undoubtedly vary from the Projections, and such variations may be material.

### IV.

### ***Legal Effect of Plan Confirmation***

1.      As to Cases Other than Individual Debtors. In cases in which the Debtor is not an individual, except as otherwise provided in the Plan or Confirmation Order, in accordance with §1141(d)(1) of the Bankruptcy Code (§1141 is entitled "Effect of confirmation"), entry of the Confirmation Order acts as a discharge effective as of the effective date of all debts of, claims against, liens on, and interest in the Debtor, its assets or properties which debts, claims, liens and interest arose at any time before the entry of the Confirmation Order.

2.      As to cases in which Debtor is an Individual. Unless after notice and hearing the Court orders otherwise for cause, confirmation of an individual Debtor's Chapter 11 Plan does not discharge any debt provided for in the Plan until the Court grants a discharge on completion of all payments under the Plan under 11 U.S.C. §1141(d)(5)(A) except that the Court may grant a discharge prior to Plan completion under sub-part (b) of that Section if there exists a lack of practical ability to modify the confirmed Plan and the distribution of all property under the Plan is no less than unsecured creditors would have received in a chapter 7 liquidation.

3.      Scope of Discharge. The discharge of the Debtor shall be effective as to each claim, regardless of whether a Proof of Claim therefor was filed, whether the claim is an allowed claim or whether the holder thereof votes to accept the Plan. On the effective date as to every discharge claim and interest any holder of such claim or interest shall be precluded from asserting against the reorganized Debtor or against *their* respective assets or properties any other or further claim or interest based upon any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation date. Further, any holder of a claim or interest shall be precluded from asserting the same against the Debtor or the reorganized Debtor, except as specifically provided for in the Plan.

4.      Injunction. In accordance with §524 ("Effect of discharge") of the Bankruptcy Code, the discharge provided by the Plan and §1141 of the Bankruptcy Code, inter alia acts as an injunction against the commencement or continuation of any action, employment of process or act to collect, offset or recover the claims discharged hereby.

5.      Applicability. Except as otherwise may be set forth in the Plan, the discharge provisions of the Plan do not apply to rights, claims or causes of action whether asserted or yet to be asserted against a non-Debtor except that no rights, claims or causes of action against Debtor can be asserted against the Debtor or reorganized Debtor.

6.      Retention of Claims. Except as otherwise provided in the Plan including without limitation any contract, instrument, release or other agreement entered into in connection with the Plan or by Order of the Bankruptcy Court in accordance with §1123(b) of the Bankruptcy Code (§1123 is entitled "Contents of plan"), the reorganized Debtor shall retain and may enforce any claims, rights and causes of action that the Debtor or their estate may hold including without limitation any claims, rights or causes of action under §544 through §550 inclusive of the Bankruptcy Code (these Bankruptcy Code sections set forth avoidance powers of a trustee) or any other applicable law. After the effective date, reorganized Debtor may pursue any such claims, rights and causes of action in accordance with what is in their best interest.

7.      Revesting and Vesting. Except as otherwise provided expressly in the Plan, on the

effective date, all property comprising the estate of the Debtor shall revest in reorganized Debtor and shall become property of the reorganized Debtor free and clear of all claims, liens, charges, encumbrances and interests of creditors and equity security holders (other than as expressly provided in the Plan). As of the effective date reorganized Debtor shall operate the business and use, acquire and dispose of property including any post-petition cash collateral and settle or compromise claims or interests without supervision of the Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than those restrictions expressly imposed by the Plan and Confirmation Order.

8.      <u>Retention of Jurisdiction by the Bankruptcy Court.</u> Notwithstanding Confirmation of the Plan or occurrence of the effective date, the Court shall retain jurisdiction over the reorganization case. Prior to the entry of a Final Order pursuant to Bankruptcy Rule 3022, the Bankruptcy Court shall retain jurisdiction:

a.      Over all claims against or interests in the Debtor;

b.      To determine the allocability of claims and interests upon objection to such claims by the Debtor or reorganized Debtor or the Creditors' Committee;

c.      To determine any tax liability pursuant to §505 (Determination of tax liability) of the Bankruptcy Code;

d.      To adjudicate any dispute under any executory lease or contract assumed during the reorganization case pursuant to §365 (Executory contracts and unexpired leases) of the Bankruptcy Code;

e.      To resolve all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease of the Debtor;

f.      To determine requests for payment of administrative claims;

g.      To resolve controversies and disputes regarding the interpretation of the Plan including the determination of the priorities of distribution required by the Articles of the Plan.

h.      To implement the provisions of the Plan and enter orders in aid of Confirmation in consummation of the Plan including without limitation, appropriate orders to enforce the right, title and powers of reorganized Debtor from actions by holders of claims against or interests in the Debtor;

i.      To determine classification voting treatment allowance estimation withdrawal disallowance or reconsideration of claims and interests and any objections relating thereto;

j.      To fix, liquidate or estimate claims or interests;

k.      To modify the Plan pursuant to §1127 (Modification of plan) of the Bankruptcy Code;

l.      To correct any defect, to cure any mistake or omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary or appropriate to carry out the purposes and intent of the Plan;

m.     To adjudicate any causes of action that arose prior to the Confirmation date or in connection with the implementation of the Plan including avoidance actions brought by the Debtor or reorganized Debtor as the representation of Debtor's estate or party in interest (as a representative of the Debtor's estate);

n.      To resolve disputes concerning any disputed claims reserve or the administration thereof and claims for disputed distribution;

o.      To resolve any disputes concerning any release of the Debtor under the Plan or the injunction against acts of employment of process, or actions against the Debtor arising under the Plan;

p.      To resolve any disputes concerning whether a personal entity had sufficient notice of the reorganization case, the applicable claims bar date, the hearing on the approval of the disclosure statement as containing adequate information, the hearing on the Confirmation of the Plan for the purpose of determining whether a claim of interest is discharged under the Plan or for any other purpose;

q.      To order the removal pursuant to §1452 (Removal of claims related to bankruptcy cases) of Title 28 of the United States Code of any suit instituted against the Debtor, the estate, the reorganized Debtor or any person released pursuant to the Plan and to hear and determine any action so removed;

r.      To enter a Final order closing the reorganization case; and

s.      To hear and determine such other matters as may be provided for under Title 28 or any other title of the United States Code and any reference to the Bankruptcy Code, the Bankruptcy Code, the Bankruptcy Rules, other applicable law, the Plan or the Confirmation Order.

**V.**

### *Summary of the Plan*

The Classes created by the Plan and their respective treatment are summarized below. The obligations under the Plan may be reduced to promissory notes within approximately six (6) months from the date of Confirmation of the Plan. The terms of such promissory notes shall not vary the terms of the Plan.

1.    *Class 1* will constitute holders of administrative expenses claims, including Debtor's attorneys. This Class will be paid in full within thirty (30) days after Confirmation unless earlier payment is authorized by the Court. The U.S. Trustee fees shall be paid in full in timely fashion pursuant to the quarterly fee payments schedule until such time as this chapter 11 case is closed. This Class is not impaired.

2.    *Class 2* will consist of the U.S. Bank, N.A. d/b/a U.S. Bank Equipment Finance Allowed Secured Claim as that term is defined in Debtor's proposed Plan. Upon Confirmation of the Plan, this Class shall be permitted to exercise all of its rights with respect to its collateral as identified in Debtor's Schedules as equipment and leasehold improvements of the Auburn 3, IN store as having a value of $8,300.00 and asserted by this Class in its Proof of Claim filed on May 25, 2018 as having a value of $11,000.00. That is, this Class may initiate any and all *in rem* collection and recovery actions it may have in connection with the aforesaid collateral. The deficiency claim of U.S. Bank d/b/a U.S. Bank Equipment Finance shall be included with and administered with Class 10 Unsecured Claims.

3.    *Class 3* will consist of The Coca Cola Company Allowed Secured Claim as that term is defined in Debtor's proposed Plan. The claim (currently estimated to be approximately $650.00) of this Class shall be paid in full pursuant to the terms of the prepetition agreements of the parties. The security interest of this Class shall continue in effect until the Allowed Claim of this Class has been paid in full.

4.    *Class 4* will consist of the Direct Capital Corporation Allowed Secured Claim as that term is defined in Debtor's proposed Plan. The Allowed Secured Claim of this Class (in the amount as per its Proof of Claim filed on May 25, 2018) shall be paid in full, With Interest. Payments shall be monthly, commencing thirty (30) days after Confirmation of the Plan based upon a three-year (36 month) amortization. The security interest of this Class shall continue in effect to secure the aforesaid Allowed Secured Claim. The monthly payments to this Class are estimated to be approximately $1,000.00 each. This Class is impaired.

5.    *Class 5* will consist of the Bridge Funding Group, Inc. Allowed Secured Claim as that term is defined in Debtor's proposed Plan. The Allowed Secured Claim of this Class, shall be paid in full, With Interest. The Allowed Secured Claim of this Class shall be deemed to be $1,375,000.00. Payment of the Allowed Secured Claim of this Class, including interest, shall continue upon Confirmation of the Plan, in the same manner and in the same monthly installments as provided in the parties' Stipulation for Adequate Protection and Plan Treatment of Bridge Funding, Inc.'s Allowed Claims (the Stipulation) (Doc. No. 272). By way of summary and not as limitation, as to treatment terms, said Stipulation provides that Vision will commence making

immediately upon Court approval monthly adequate protection payments to Bridge in an amount to be determined by amortizing Bridge's allowed secured claim over ten ( 10) years at an interest rate of 6.5% fixed. Further, to the extent that Vision exceeds current projections with respect to the generation of cash ("Excess Cash"), such Excess Cash will be paid to Bridge and applied as a principal payment on a semiannual basis, i.e., if cash exceeds the amount stated in the three (3) year projection in the line item entitled "forecasted cash flow at the end of" as to the 7th and 13th periods and semiannually thereafter, such Excess Cash shall be paid to Bridge as a principal paydown, provided that all allowed attorney's fees of the debtor, either pre or post-confirmation, have been fully paid. In the event all allowed attorney's fees have not been fully paid to debtor's counsel, one-half of any such Excess Cash shall be paid as a principal paydown to Bridge, and one-half shall be applied to allowed attorney's fees of the debtor. Additionally, post-confirmation, continuing until the Bridge Claim has been paid in full, the reorganized debtor will prepare and provide to Bridge a combined management report prepared on a GAAP basis, P&L statement and balance sheet, all on a quarterly basis and tied to that quarter's franchisor-generated monthly combo reports and it shall use a qualified third-party CPA accounting firm acceptable to Bridge to provide a compilation statement and a consolidated balance sheet and P&L in accordance with GAAP. The remaining principal balance on the Allowed Secured Claim together with any unpaid interest thereon shall be due and payable on the sixty-first (61st) month following Confirmation of the Plan. The monthly payments to this Class are $15,612.85 each. This Class is impaired.

The security interest of this Class shall continue as security for the amount of the Allowed Secured Claim under the Plan. The deficiency claim of Bridge Funding Group, Inc., in the amount of $144,710.85, shall be included in, and administered with, Class 10 Unsecured Claims.

6.    *Class 6* will consist of the First Merchants Bank Allowed Secured Claim as that term is defined in Debtor's proposed Plan. The guaranty liability of this Class shall continue in effect. Any outstanding indebtedness shall be secured up to the value of this Class' security interest in the Debtor's assets. Said value shall be in the amount as agreed by the parties, or, in the event the parties cannot agree, as determined by the Court. The mortgage obligor (for whom the guaranty claim of the Class pertains) is presently current on its mortgage loan payments and will continue to make such payments. Accordingly, there will be no payments to this Class by the Debtor except in the event of a default on the guarantied obligation. Further, payments thereon, With Interest, shall then commence monthly based upon a five (5) year amortization. This Class is impaired. The deficiency claim of First Merchants Bank shall be included in, and administered with, Class 10 Unsecured Claims.

7.    *Class 7* will consist of the Americredit Financial Services, Inc. d/b/a GM Financial Allowed Secured Claim as that term is defined in Debtor's proposed Plan. The Allowed Secured Claim of this Class shall be paid in full pursuant to the prepetition agreements of the parties. Provided, however, that any pre-confirmation defaults shall be cured upon Confirmation of the Plan and all default charges to that date shall be deemed waived. The security interest of this Class shall continue in effect. The monthly payments to this Class are $911.00 each. This Class is impaired.

8.    *Class 8* will consist of the Deere & Company d/b/a John Deere Financial Allowed Secured Claim as that term is defined in Debtor's proposed Plan. This Class shall be paid in full

pursuant to the parties Stipulation Regarding Adequate Protection and Loan Contract – Security Agreement provided that any pre-confirmation defaults other than as provided in the Adequate Protection stipulation shall be deemed waived. The monthly payments to this Class are $76.44 each. This Class is impaired.

9.    *Class 9* will consist of Priority Tax Claims. This Class shall be paid in full, with interest accruing from and after Confirmation at the I.R.C. Rate in effect as of Confirmation of the Plan. Payments shall be on a quarterly basis based upon a five (5) year, straight amortization. The first quarterly installment shall be due ninety (90) days after Confirmation. The quarterly payment to this Class are estimated to be $1,400.00. This Class is not impaired.

10.    *Class 10* will consist of Unsecured Claims. This Class shall include all claims not specifically included in Classes 1 through 9 including, but not limited to, the deficiency claims of the Classes 2, 5, and 6 and the claim of On Deck Capital (Proof of Claim No. 1). This Class shall neither have nor retain any lien on the Debtor's property. The Allowed Claims of this Class shall receive a pro rata distribution of an annual $2,000.00 payment to this Class for five (5) consecutive years, commencing with the first such annual payment one (1) year after Confirmation of the Plan. This Class is impaired.

11.    *Class 11* will consist of the interest holders. All pre-petition equity security interests of Debtor shall be canceled. The stock of the newly-reorganized Debtor shall be issued to James E. Miller II on the terms and conditions set forth in the Plan.

**THE FOREGING IS A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. CREDITORS ARE FURTHER URGED TO CONSULT WITH COUNSEL, OR WITH EACH OTHER, IN ORDER TO FULLY UNDERSTAND THE PLAN.**

******

**ADDITIONALLY, ANY CREDITOR DESIRING INFORMATION REGARDING THE DEBTOR THAT SUCH CREDITOR BELIEVES IS NOT SUPPLIED BY THE DISCLOSURE STATEMENT IS REQUESTED TO CONTACT THE ATTORNEYS FOR THE DEBTOR.**

VISION INVESTMENT GROUP, INC.

James E. Miller, II, President

## <u>CERTFICATE OF SERVICE</u>

The undersigned, who is duly admitted to practice in the State of Indiana and before the Court, hereby certifies that a copy of the above and foregoing was transmitted electronically through the Bankruptcy Court's ECF System, on February 20, 2019, to the following:

Leonard W. Copeland
Nancy J. Gargula
Office of the United States Trustee
One Michiana Square, Suite 555
100 E. Wayne Street
South Bend, IN 46601

Michael P. O'Hara
Thomas P. Yoder
BARRETT McNAGNY LLP
215 East Berry Street
Fort Wayne, IN 46801
Attorneys for First Merchants Bank

Harley K. Means
KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204-5125
Attorney for Ford Motor Credit Company LLC

Kenneth D. Peters
DRESSLER & PETERS LLC
70 W. Hubbard Street, Suite 200
Chicago, IL 60654
Attorney for Direct Capital Corporation

The undersigned further certifies that a copy of the above and foregoing was sent by first class United States mail, postage prepaid on February 20, 2019, to the following:

Vision Investment Group, Inc.
c/o James E. Miller, II, President
P.O. Box 415
Bluffton, IN 46714

Americredit Financial Services, Inc. dba GM Financial
PO Box 183853
Arlington, TX 76096

/s/ Scot T. Skekloff
Scot T. Skekloff (#15849-02)

# EXHIBIT A

The following is a monthly forecast (FORECAST columns spanning periods labeled 1SP1 through 1SP13, e.g. 12/2018–1/2019 … 12/2019) for VISION INVESTMENT GROUP, INC, together with a Total Yr 1 column.

| VISION INVESTMENT GROUP, INC | Total Yr 1 |
|---|---|
| a  Gross Sales (Sales plus coupon) | 13,302,510 |
| b  (o)Less Discounts (coupon) | (1,077,503) |
| 2. Total Cash Receipts | 12,225,007 |
| **4. Expenses** | |
| a  Cost of Goods Sold | 3,879,882 |
|     COGS Rebate (2017 $ rounded) | (155,100) |
| b  Gross Wages | 3,586,211 |
| c  Payroll Taxes | 297,655 |
| d  Background Check & Drug Screening Expense | 35 |
| e  Rent & Real Estate Taxes | 619,308 |
| f  Insurance-CAM | 6,096 |
| g  CAM Charges | 71,668 |
| h  Computer/Security/Network Expense | 14,601 |
| i  Corporate Credit Profiles | 34,275 |
| j  Laundry/Air Freshener | 15,314 |
| k  Office Supplies | 19,500 |
| l  Advertising - FAF | 550,125 |
| m  Advertising - Other | 24,047 |
| n  Bank Charges | 10,400 |
| o  Credit Card Process Fees | 170,907 |
| p  Cash (SUBA/LOYALTY) Card Processing Fees | 21,236 |
| q  PayPal Fees | 260 |
| r  Quickbooks/Register Fee | 1,950 |
| s  Transportation Expense | 122,811 |
| t  Repairs & Maintenance-Labor | 6,500 |
| u  Repairs & Maintenance-Materials | 61,038 |
| v  Repairs & Maintenance-Other | 1,275 |
| w  Repairs & Maintenance-Landscaping | 1,888 |
| x  Payroll Processing Fees | 16,563 |
| y  Personal Property Taxes | 29,065 |
| z  Pest Control | 7,020 |
| aa  Postage | 3,662 |
| ab  Phone/Internet | 71,666 |
| ac  TV/Music-Stores | 2,530 |
| ad  Utilities - Electric | 274,672 |
| ae  Utilities - Gas | 17,091 |
| af  Utilities - Water/Wastewater | 12,208 |
| ag  Uniforms | 10,275 |
| ah  Trash | 34,181 |
| ai  Legal Fees | 5,350 |
| aj  Consulting & Professional Fees | 47,223 |
| ak  Consulting Fees - Server Hosting Fees | 13,260 |
| al  Royalties | 978,001 |
| am  Insurance-Workers Compensation | 22,824 |
| an  Liability Insurance | 25,404 |
| ao  Life Insurance | 15,169 |
| ap  Health Insurance Premium | 101,568 |
| aq  Licenses & Fees | 10,275 |
| ar  Seminars & Conferences | 2,950 |
| as  Travel & Lodging & Meals | 47,223 |
| at  Training Materials | 15,000 |
| au  Miscellaneous | 13,260 |
| av  Cash (over) short | 11,630 |
| aw  Debt Repayments-post Bankruptcy | 70,228 |
| ax  Insider Compensation | 26,000 |
| ay  Equipment, Fixtures & Leasehold Improvements |  |
| az  Ohio City Taxes | 1,400 |
| ba  Ohio Commercial Activity Tax |  |
| bb  Ohio Pass Through Entity Tax |  |
| bc  Michigan Flow Through Tax | 245 |
| bd  OH, OK Alcohol Bev & Food-Beverage Taxes - cash remitted |  |
| be  Other Income (Ohio Sales Tax Discount) | 758,094 |
| bf  Trustee Quarterly Fees (1%) | (2,167) |
|     Subtotal expenses | 121,095 |
| FORECASTED CASH FLOW (net per period) | 12,303,599 |
| Less: Debt Service | (78,593) |
| ** Forecasted Cash flow for period after debt service | 209,160 |
|     Forecasted cash flow beg period |  |
|     Forecasted cash flow end period |  |

E:\VIG\Forecast\VIG forecast as of 01.28.19\01.28.19 FINAL

**VISION INVESTMENT GROUP, INC**

| | FORECAST 20Y1 | FORECAST 20Y2 | FORECAST 20Y3 | FORECAST 20Y4 | FORECAST 20Y5 | FORECAST 20Y6 | FORECAST 20Y7 | FORECAST 20Y8 | FORECAST 20Y9 | FORECAST 20Y10 | FORECAST 20Y11 | FORECAST 20Y12 | FORECAST 20Y13 | Total Yr 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a  Gross Sales (Sales plus coupon) | 895,894 | 973,090 | 985,756 | 1,137,419 | 1,125,081 | 329,759 | 318,950 | 1,108,213 | 302,921 | 279,358 | 265,061 | 255,055 | 893,852 | 13,229,545 |
| b  (e) Less: Discounts (coupons) | (73,015) | (79,307) | (80,339) | (92,700) | (91,694) | (86,055) | (85,033) | (83,204) | (86,023) | (79,287) | (75,200) | (72,849) | (893,852) | (1,078,208) |
| 2. Total Cash Receipts | 822,879 | 893,783 | 904,174 | 1,044,720 | 1,033,387 | 1,017,093 | 1,017,093 | 969,840 | 937,700 | 969,477 | 893,564 | 847,503 | 821,003 | 12,151,338 |
| **4. Expenses** | | | | | | | | | | | | | | |
| a  Cost of Goods Sold | 257,418 | 279,436 | 310,597 | 283,037 | 332,277 | 329,759 | 318,950 | 318,950 | 302,921 | 302,921 | 279,358 | 265,061 | 255,055 | 3,810,043 |
| a  COGS Freight (2017 $ rounded) | 240,403 | (24,000) | (5,100) | | | | | | (28,000) | (28,000) | | | (98,000) | (155,100) |
| b  Gross Wages | 240,403 | 262,029 | 292,648 | 265,577 | 308,064 | 304,608 | 298,882 | 285,216 | 275,423 | 285,115 | 261,962 | 247,914 | 239,831 | 3,567,683 |
| c  Payroll Taxes | 19,553 | 21,748 | 24,290 | 22,043 | 25,559 | 25,282 | 24,807 | 23,674 | 22,860 | 23,665 | 21,743 | 20,577 | 19,906 | 296,118 |
| d  Background Check & Drug Screening Expense | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 455 |
| e  Bank Card/Acct Fees & Penalties Taxes | 49,444 | 51,144 | 49,444 | 59,556 | 49,444 | 51,144 | 51,774 | 49,444 | 49,444 | 49,444 | 49,444 | 59,556 | 49,444 | 619,338 |
| f  Insurance-CAM | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 6,096 |
| g  CAM Charges | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 71,868 |
| h  Computer/Security/Network Expense | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 14,001 |
| i  Operating Supplies | 2,279 | 2,476 | 2,754 | 2,508 | 2,894 | 2,862 | 2,820 | 2,698 | 2,609 | 2,697 | 2,486 | 2,358 | 2,267 | 33,700 |
| j  Commissions to Purchaser | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,267 | 15,434 |
| k  Office Supplies | 1,000 | 1,500 | 1,000 | 1,000 | 1,500 | 2,000 | 1,500 | 2,000 | 2,000 | 1,000 | 1,500 | 2,000 | 1,500 | 19,500 |
| l  Advertising - FAF | 37,030 | 40,220 | 44,738 | 40,744 | 47,012 | 46,502 | 45,905 | 43,643 | 42,196 | 43,626 | 40,210 | 38,138 | 36,945 | 546,810 |
| m  Advertising - Other | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 24,347 |
| n  Bank Charges | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 7,020 |
| o  Credit Card Process Fees | 11,520 | 12,513 | 13,918 | 12,676 | 14,616 | 14,467 | 14,251 | 13,578 | 13,128 | 13,573 | 12,510 | 11,865 | 11,494 | 170,119 |
| p  Cash (SUB LOYALTY) Card Processing Fees | 1,760 | 1,825 | 1,918 | 1,836 | 1,965 | 1,954 | 1,940 | 899 | 870 | 899 | 1,829 | 1,786 | 1,755 | 21,236 |
| q  PayPal Fees | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 260 |
| r  Catering Call Center Fee | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,950 |
| s  Transportation Expense | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 500 | 500 | 500 | 9,269 | 9,169 | 9,168 | 95,130 |
| t  Repairs & Maintenance-Labor | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,500 |
| u  Repairs & Maintenance-Materials | 4,114 | 4,469 | 4,971 | 4,537 | 5,224 | 5,167 | 5,089 | 4,849 | 4,688 | 4,647 | 4,468 | 4,238 | 4,105 | 60,757 |
| v  Repairs & Maintenance-Other | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 2,275 |
| w  Repairs & Maintenance-Landscaping | 1,200 | 1,200 | 1,200 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 1,200 | 11,865 |
| x  Payroll Processing Fees | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 8,206 | 1,250 | 29,065 |
| y  Personal Property Taxes | | 7,134 | | | 8,206 | | | 5,519 | | | | | | 20,065 |
| z  Pest Control | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 7,020 |
| aa  Postage | 247 | 268 | 298 | 272 | 313 | 310 | 305 | 291 | 281 | 291 | 268 | 254 | 246 | 3,645 |
| ab  Telephone/Internet | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 71,695 |
| ac  Utilities - Electric | 18,515 | 20,110 | 22,369 | 20,372 | 23,506 | 23,251 | 22,903 | 21,821 | 21,098 | 21,813 | 20,105 | 19,069 | 18,473 | 273,405 |
| ad  Utilities - Gas | 1,152 | 1,251 | 1,392 | 1,268 | 1,463 | 1,447 | 1,425 | 1,358 | 1,313 | 1,357 | 1,251 | 1,187 | 1,149 | 17,012 |
| ae  Utilities - Water/Wastewater | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,551 | 46,151 |
| af  Uniforms | 823 | 894 | 994 | 905 | 1,045 | 1,033 | 1,018 | 970 | 939 | 969 | 894 | 848 | 821 | 12,151 |
| ag  Rent | 2,500 | 2,784 | 2,536 | 2,535 | 2,925 | 2,893 | 2,848 | 2,716 | 2,626 | 2,715 | 2,500 | 2,373 | 2,299 | 32,340 |
| ah  Legal Fees | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| ai  Consulting & Professional Fees | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 5,850 |
| aj  Accounting Fees + Server Hosting Fees | 2,377 | 2,377 | 2,377 | 2,377 | 2,377 | 2,377 | 2,377 | 1,377 | 1,377 | 1,377 | 1,377 | 1,377 | 2,377 | 25,961 |
| ak  Franchise | 65,530 | 79,534 | 72,433 | 83,678 | 82,671 | 81,851 | 73,587 | 73,587 | 67,800 | 67,800 | 71,485 | 63,682 | 63,682 | 972,017 |
| al  Employee-Workers Compensation | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 22,824 |
| am  Liability Insurance | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 268 | 254 | 2,117 | 25,404 |
| an  Life Insurance | 2,683 | | 2,683 | 2,683 | | | 4,830 | 1,560 | | 2,683 | | | 730 | 15,169 |
| ao  Health Insurance Premium | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 9,141 | 109,693 |
| ap  Business & Licenses | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 1,100 | 375 | | | | | 1,000 | 1,100 | 10,275 |
| aq  Seminars & Conferences | | | | | | | | 2,950 | | | | | | 2,950 |
| ar  Travel & Lodging & Meals | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,330 | 46,098 |
| as  Training Materials | | 7,345 | | | | | | | 7,655 | | | | | 15,000 |
| at  Miscellaneous | 1,020 | 1,020 | 1,000 | 1,020 | 1,000 | 1,000 | 1,000 | 1,020 | 1,000 | 1,020 | 1,010 | 1,000 | 1,000 | 13,110 |
| au  Cash Short & Over | 815 | 835 | 905 | 897 | 905 | 1,024 | 515 | 961 | 939 | 947 | 937 | 940 | 1,001 | 11,620 |
| av  Debt Repayment-post Bankruptcy | | | | | | | | | | | | | | |
| aw  Insider Compensation | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 68,900 |
| ax  Equipment, Fixtures & Leasehold Improvements | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 26,000 |
| ay  Ohio City Taxes | | | | | | | | | | | | | | |
| az  Ohio Commercial Activity Tax | | 220 | | 220 | | 225 | | 245 | | 245 | | | 245 | 1,400 |
| bb  Ohio Pass Through Entity Tax | | | | | | | | | | | | | | |
| bc  Michigan Flow Through Tax | | | | | | | | | | | | | | |
| bd  IN, OH, MI Sales & Use & Food-Beverage Taxes - cash remitted | 51,101 | 55,504 | 61,738 | 56,226 | 64,877 | 64,173 | 63,211 | 60,055 | 58,132 | 60,204 | 55,490 | 52,630 | 50,584 | 754,598 |
| be  Total Operating Taxes (State Tax Discount) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) |
| bf  Tot Oh Bus Txs Fees (1%) | | | | | | | | | | | | | | |
| Subtotal expenses | 833,326 | 885,901 | 977,195 | 905,722 | 1,050,033 | 1,023,368 | 1,003,091 | 968,366 | 908,451 | 965,352 | 824,677 | 870,227 | 731,370 | 11,946,979 |
| **FORECASTED CASH FLOW (in period)** | (10,447) | 7,882 | 16,978 | (306) | (5,314) | 10,019 | 14,003 | 1,574 | 29,249 | 4,124 | 68,886 | (22,723) | 89,633 | 204,358 |
| Less: Debt Service | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 209,160 |
| ** Forecasted Cash flow for period after debt service | (27,877) | (9,548) | (452) | (17,736) | (22,744) | (7,411) | (2,627) | (15,856) | 11,819 | (13,306) | 51,456 | (40,153) | 72,203 | (4,802) |
| * Forecasted cash flow beg period | 137,841 | 109,964 | 100,416 | 99,964 | 82,228 | 59,484 | 52,073 | 49,446 | 33,590 | 45,409 | 32,103 | 100,559 | 60,036 | 133,039 |
| Forecasted ending cash flow end period | 109,964 | 100,416 | 99,964 | 82,228 | 59,484 | 52,073 | 49,446 | 33,590 | 45,409 | 32,103 | 100,589 | 60,036 | 133,039 | |

** Forecasted cash flow as of 01.28.19 (2.13.19 FINAL)
E:\\VIG\\Forecast\\VIG forecast as of 01.28.19 (2.13.19 FINAL)

2/13/2019

**VISION INVESTMENT GROUP, INC**

| | FORECAST 21P1 | FORECAST 21P2 | FORECAST 21P3 | FORECAST 21P4 | FORECAST 21P5 | FORECAST 21P6 | FORECAST 21P7 | FORECAST 21P8 | FORECAST 21P9 | FORECAST 21P10 | FORECAST 21P11 | FORECAST 21P12 | FORECAST 21P13 | Total Yr 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a  Gross Sales (Sales plus coupon) | 904,853 | 982,821 | 1,093,212 | 995,613 | 1,148,793 | 1,136,331 | 1,119,295 | 1,066,454 | 1,031,113 | 1,066,055 | 982,579 | 931,931 | 902,790 | 13,361,841 |
| b  (e) Less Discounts (coupons) | (74,198) | (80,593) | (89,643) | (81,640) | (94,201) | (93,179) | (91,282) | (87,449) | (84,551) | (87,416) | (80,572) | (76,418) | (74,029) | (1,095,572) |
| 2  Total Cash Receipts | 830,655 | 902,229 | 1,003,569 | 913,973 | 1,054,592 | 1,043,152 | 1,027,513 | 979,005 | 945,561 | 978,638 | 902,008 | 855,512 | 828,762 | 12,266,270 |
| **4. Expenses** | | | | | | | | | | | | | | |
| a  Cost of Goods Sold | 259,872 | 283,101 | 313,573 | 285,748 | 333,419 | 329,866 | 321,009 | 305,945 | 295,689 | 305,831 | 282,032 | 267,592 | 258,854 | 3,841,251 |
|    COGS Rebates (2017 & rounded) | | (24,000) | | | | | | | | | | | | (5,100) |
| b  Gross Wages | 242,775 | 264,605 | 295,513 | 268,187 | 310,076 | 307,586 | 302,816 | 288,022 | 278,126 | 287,910 | 264,537 | 250,356 | 242,197 | 3,602,707 |
| c  Payroll Taxes | 20,150 | 21,962 | 24,528 | 22,259 | 25,736 | 25,530 | 25,134 | 23,906 | 23,084 | 23,897 | 21,957 | 20,780 | 20,102 | 299,025 |
| d  Background Check & Drug Screening Expense | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 260 |
| e  Rent & Real Estate Taxes | 49,444 | 51,144 | 49,444 | 49,444 | 59,556 | 51,144 | 51,174 | 49,444 | 49,444 | 49,444 | 49,444 | 59,556 | 49,444 | 619,838 |
| f  Insurance-CAM | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 508 | 6,096 |
| g  CAM Changes | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 5,989 | 71,868 |
| h  Computer/Security/Network Expense | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 1,077 | 14,001 |
| i  Operating Supplies | 2,279 | 2,476 | 2,754 | 2,508 | 2,894 | 2,862 | 2,820 | 2,698 | 2,609 | 2,697 | 2,486 | 2,358 | 2,267 | 33,709 |
| j  Office Equipment Rental | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 1,178 | 15,314 |
| k  Office Supplies | 1,000 | 1,500 | 2,000 | 1,200 | 1,500 | 1,000 | 1,500 | 2,000 | 1,000 | 1,000 | 1,500 | 2,000 | 1,500 | 19,500 |
| l  Advertising - FAF | 37,379 | 40,600 | 45,161 | 41,129 | 47,457 | 46,942 | 46,238 | 44,055 | 42,595 | 44,039 | 40,590 | 38,493 | 37,294 | 551,978 |
| m  Advertising - Other | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 1,873 | 24,347 |
| n  Bank Charges | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 10,400 |
| o  Credit Card Process Fees | 11,929 | 12,831 | 14,002 | 12,796 | 14,764 | 14,604 | 14,385 | 13,706 | 13,252 | 13,701 | 12,628 | 11,977 | 11,603 | 172,176 |
| p  Cash (GURA/LOYALTY) Card Processing Fees | 1,760 | 1,825 | 1,918 | 1,836 | 1,965 | 1,954 | 1,940 | 1,899 | 870 | 899 | 1,829 | 1,786 | 1,755 | 21,236 |
| q  PayPal Fees | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 260 |
| r  Catering Call Center Fee | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,950 |
| s  Transportation Expense | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,269 | 9,108 | 120,334 |
| t  Repairs & Maintenance-Labor | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 6,500 |
| u  Repairs & Maintenance-Materials | 4,133 | 4,511 | 5,018 | 4,570 | 5,273 | 5,216 | 5,138 | 4,895 | 4,733 | 4,893 | 4,510 | 4,278 | 4,144 | 61,331 |
| v  Repairs & Maintenance-Other | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 175 | 2,275 |
| w  Repairs & Maintenance-Landscaping | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 785 | 11,865 |
| x  Payroll Processing Fees | 1,200 | 1,200 | 1,200 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,200 | 16,050 |
| y  Personal Property Taxes | | | | | | | | | | | | 8,206 | | 29,065 |
| z  Pest Control | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 540 | 7,020 |
| aa Postage | 249 | 271 | 301 | 274 | 316 | 313 | 308 | 294 | 284 | 294 | 271 | 257 | 249 | 3,680 |
| ab Telephone/Internet | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 5,515 | 71,695 |
| ac Utilities - Electric | 18,690 | 20,300 | 22,580 | 20,554 | 23,728 | 23,471 | 23,119 | 22,028 | 21,198 | 22,019 | 20,205 | 19,249 | 18,647 | 275,589 |
| ad Utilities - Gas | 1,163 | 1,263 | 1,405 | 1,280 | 1,476 | 1,460 | 1,439 | 1,371 | 1,325 | 1,370 | 1,263 | 1,198 | 1,160 | 17,173 |
| ae Utilities - Water/Wastewater | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,550 | 3,551 | 46,151 |
| af Uniforms | 831 | 902 | 1,004 | 914 | 1,055 | 1,043 | 1,028 | 979 | 947 | 979 | 902 | 856 | 829 | 12,156 |
| ag Legal Fees | 2,826 | 2,826 | 2,826 | 2,826 | 2,826 | 2,826 | 2,826 | 2,826 | 2,741 | 2,826 | 2,826 | 2,826 | 2,831 | 36,545 |
| ah Consulting & Professional Fees | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| ai Accounting Fees + Server Hosting Fees | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 5,850 |
| aj Royalties | 2,377 | 2,377 | 2,377 | 2,377 | 2,377 | 2,377 | 2,377 | 1,377 | 1,377 | 1,377 | 1,377 | 1,377 | 2,377 | 25,901 |
| ak Insurance-Workers Compensation | 66,452 | 72,178 | 80,285 | 73,116 | 84,367 | 83,453 | 82,201 | 78,320 | 75,725 | 78,291 | 72,161 | 68,441 | 66,301 | 981,294 |
| al Liability Insurance | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 1,902 | 23,829 |
| am Life Insurance | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 2,117 | 25,404 |
| an Health Insurance Premium | 2,683 | | | 2,683 | | | 4,830 | | | 2,683 | | | 730 | 15,169 |
| ao Auto Expense | 1,560 | | | | 2,950 | | | | | | | | | 1,560 | 4,510 |
| ap Seminars & Conferences | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 9,872 | 118,468 |
| aq Travel & Lodging & Meals | 1,100 | 7,345 | | | | | | | | 375 | | 1,100 | 1,100 | 10,275 |
| ar Training Materials | | | | | | | | | | | | | | 2,950 |
| as Miscellaneous | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,564 | 3,330 | 46,098 |
| at Debt Repayment-post Bankruptcy | 1,020 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 15,000 |
| au Insider Compensation | 815 | 885 | 985 | 897 | 1,034 | 1,004 | 515 | 961 | 929 | 947 | 840 | 840 | 1,001 | 13,260 |
| av Equipment, Fixtures & Leasehold Improvements | | | | | | | | | | | | | | 11,630 |
| aw Ohio City Taxes | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 5,300 | 68,903 |
| ax Ohio Commercial Activity Tax | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 26,000 |
| ay Ohio Pass Through Entity Tax | | 220 | | 220 | | | 225 | | | 245 | | | 245 | 1,400 |
| az Michigan Flow Through Tax | | | | | | | | | | | | | | |
| bd IN, OH, MI Sales & Use & Food-Beverage Taxes - cash remitted | 51,584 | 56,038 | 62,322 | 56,758 | 65,490 | 64,780 | 63,609 | 60,796 | 58,781 | 60,773 | 56,015 | 53,117 | 51,466 | 761,729 |
| be Other Income (Sales Tax Discount) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (167) | (2,167) |
| bf Transfer Process Fees (1%) | | | | | | | | | | | | | | |
|    Subtotal expenses | 840,900 | 894,074 | 986,215 | 913,993 | 1,056,397 | 1,029,719 | 1,012,394 | 977,280 | 916,995 | 974,164 | 832,117 | 878,009 | 738,920 | 12,050,076 |
|    FORECASTED CASH FLOW (in period) | (10,245) | 8,155 | 17,353 | (20) | (1,804) | 13,433 | 15,119 | 1,925 | 29,567 | 4,475 | 69,891 | (22,497) | 89,842 | 215,194 |
|    Less: Debt Service | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | 17,430 | (97,620) | 209,160 |
|    ** Forecasted Cash flow for period after debt service | (27,675) | (9,275) | (77) | (17,450) | (19,234) | (3,997) | (2,311) | (15,505) | 12,137 | (12,955) | 69,891 | (39,927) | 72,412 | 6,034 |
|    Forecasted cash flow/pay period | 133,039 | 105,364 | 96,089 | 96,013 | 78,562 | 59,328 | 55,331 | 53,021 | 37,515 | 49,652 | 36,697 | (39,927) | 72,412 | |
|    Forecasted cumulative cash flow end period | 105,364 | 96,089 | 96,013 | 78,562 | 59,328 | 55,331 | 53,021 | 37,515 | 49,652 | 36,697 | 106,588 | 66,661 | 139,073 | |